(No. 15797.—Decree affirmed.)

THE EQUITABLE TRUST COMPANY OF NEW YORK, Trustee, Defendant in Error, *vs.* THE CHICAGO, PEORIA AND ST. LOUIS RAILROAD COMPANY *et al.*—(EDWARD J. BRUNDAGE, Attorney General, Plaintiff in Error.)

*Opinion filed October 28, 1924.*

1. RAILROADS—*decree for foreclosure sale does not affect public interest in operation of road.* A decree of sale in a foreclosure proceeding for the bonded indebtedness of a railroad company does not affect the public interest in the operation of the road even though it is to be sold in parcels, and the Attorney General has no standing in such suit as against the right of the complainant, as the question of the operation of the road is no part of the issue in foreclosure and can only be made an issue by proper proceeding against the purchaser or purchasers.

2. SAME—*purchaser of railroad takes it subject to public interest in its continued operation.* Purchasers of a railroad, whether it is sold in entirety or in parcels to different purchasers, take it affected with the same public interest in its continued operation as existed when it was in the hands of the former owner, and should the purchaser or purchasers cease operation or begin or threaten to dismantle the road, the Attorney General has the same right to proceed against said purchasers in behalf of the public as he had against the former owner.

3. SAME—*owner cannot be compelled to operate a railroad at a loss.* The owner of a railroad cannot be compelled, for the benefit of the public, to continue operation of the railroad at a loss, as such compulsion would amount to taking private property for public benefit without compensation.

4. MORTGAGES—*sales will be so conducted as to prevent injustice.* In the foreclosure of mortgages the court will control sales under its decrees so that no injustice will be done to either party to the proceeding.

STONE, FARMER and HEARD, JJ., dissenting.

WRIT OF ERROR to the Circuit Court of Sangamon county; the Hon. ELBERT S. SMITH, Judge, presiding.

EDWARD J. BRUNDAGE, Attorney General, ALBERT D. RODENBERG, GEORGE C. DIXON, JAMES B. SEARCY, and EDWARD B. HAYES, for plaintiff in error.

MURRAY, PRENTICE & ALDRICH, and WINSTON, STRAWN & SHAW, (SILAS H. STRAWN, I. HOWARD LEHMAN, and WALTER H. JACOBS, of counsel,) for defendant in error the Equitable Trust Company.

HENRY A. CONVERSE, and PHILIP BARTON WARREN, for the receivers of the Chicago, Peoria and St. Louis Railroad Company.

Mr. JUSTICE DUNN delivered the opinion of the court:

The circuit court of Sangamon county on June 21, 1923, rendered a decree of foreclosure in the case of the Equitable Trust Company of New York against the Chicago, Peoria and St. Louis Railroad Company and others, finding that there was due on the bonds secured by the mortgage in which the complainant was trustee, which was the first mortgage lien on the property of the railroad company, $2,522,678.07, on the bonds secured by the refunding mortgage, which was a subsequent lien, $2,884,510.95, and that $295,000 of receiver's certificates were outstanding. In default of payment of the amount due on the first mortgage it was decreed that all the railways and property of the railroad company be sold by the special master appointed in the cause, and that in making such sale he should first offer the right, title and interest of the railroad company in one parcel of the property known as parcel 12, consisting of certain equipment included in a conditional sale agreement, and should then offer certain real estate known as parcel 12*a*, at an upset price for each parcel; that he should then offer for sale as one parcel, as an entirety, all of the other property, noting the highest bid for such property as an entirety, and that he should then offer for sale in separate parcels all the property except parcels 12 and 12*a* in certain fixed parcels and certain combinations of parcels of the property, except parcels 12 and 12*a*, noting the highest bid for each offer, the bids producing the largest return to be accepted. The number of parcels in which the prop-

314—7

erty, except parcels 12 and 12*a,* could be sold was eighteen. On July 11 the Attorney General, on behalf of the People, filed a motion for leave to file an intervening petition to modify the decree. The intervening petition was not then presented, but on September 18, 1923, at the hearing of the motion, it was presented and the motion was denied. The Attorney General prayed an appeal, which was also denied, and he has sued out a writ of error.

The bonds involved in this suit represent money advanced to the railroad company, and the object of the suit was to secure payment to the bondholders of the indebtedness, the validity or amount of which was not questioned. The parties to the suit are the trustees in the mortgages, (who represent the bondholders,) the railroad company, and the receivers of the railroad company who were appointed on a previous bill to foreclose the refunding mortgage, whose receivership was extended to this suit and who are in possession of the property. All persons who were either necessary or proper parties to the foreclosure suit were made parties. None of them has sued out a writ of error or made any objection to the decree, or, so far as appears, could make any valid objection. The right of the Attorney General to intervene is based upon the interest of the State in the continued operation of the railroad and the assumption that the effect of the decree and a sale under it will necessarily be the discontinuance of the operation of trains and the dismantling of the road. There is no doubt about the interest of the State in the continued operation of the railroad, but the decree does not in any way affect that interest. The proceeding was an ordinary bill in chancery for the foreclosure of a mortgage on the property of a railroad company. There was no question about the existence or amount of the debt, the extent of the lien or the complainant's right to the usual relief of a decree for the sale of the mortgaged property, and such a decree was entered. There was no issue in which the State was

concerned. It was not a party, and neither the complainant nor the defendants could make it a party. The court did not adjudicate upon the question of the abandonment or dismantling of the road or the cessation of its operation. The property of the railroad company is affected with a public interest, but that interest is not affected by the decree. "The foreclosure was not a proceeding *in rem* and could confer no rights except those existing in the mortgagor. A purchaser at the sale would acquire all such rights as the mortgagor had to stop operations, whatever words were used in the decree, and, whatever the words, would get no more." (*Bullock* v. *State of Florida,* 254 U. S. 513.) If the road and all the property is sold as an entirety the purchaser will take it affected with the same public interest as the present owner. If this property is sold in separate parcels, the purchaser or purchasers, one or several, will take it affected with the same public interest. Should the purchaser or purchasers then cease operation or begin or threaten to dismantle the road or abandon operation, the Attorney General would have the same right then against the purchaser or purchasers as he has now against the present owner. His remedy by *mandamus* or injunction, if he has any such remedy against the present company, would be equally available against the purchaser. That the franchise of the corporation is indivisible and upon a sale in parcels would not attach to the separate parcels is not a valid objection. Whether the property is sold in its entirety or not, it will not be operated by reason of the franchise of the present owner. Without regard to that franchise the purchaser may organize a corporation under the general law for that purpose, and if the sale is in parcels a corporation may be organized for the operation of any part. In the foreclosure of mortgages it is the rule that the court will control sales under its decrees so that no injustice will be done to either party. Ordinarily a sale by parcels where the property is divisible is the proper mode,

and it is not unusual, according to the circumstances of the case, to provide for an offering both by parcels and in entirety, with a view to the most beneficial result to the parties. Whether the parties can by stipulation in the mortgage control the discretion of the court as to the method of sale is of no importance here, for the reason that if there were any such stipulation the parties to the mortgage have waived it and are not complaining of the decree. It cannot be said that any injury to the public interest will result from a sale in any method provided by the decree. It is not within the issues of a foreclosure suit to determine whether the purchaser under the decree shall operate the road or not, and no such issue was determined. The Attorney General has no standing in such a suit. The complainant in the foreclosure suit has an undisputed right to recover the money due on the bonds by the sale of the mortgaged property and to have the sale made in such way as will produce the most money to apply on the debt. The constitution provides that it cannot be deprived of its property by denying it this right without compensation in order that the public interest in the continued operation of the railroad may be preserved. No one can be required to continue such operation at a loss for the public good. Such compulsion would amount to taking private property for the public benefit without compensation. *Brooks-Scanlon Co.* v. *Railroad Com.* 251 U. S. 396.

The public interest represented by the Attorney General was not affected by the decree and he had no right to intervene.

The decree was right, and it is affirmed.

*Decree affirmed.*

Mr. Justice Stone, dissenting:

I cannot concur in the opinion filed in this case. It holds that the Attorney General, on behalf of the People, had no right to intervene. It does not hold, and it is not the law,

that a party whose interests are affected has no right to a writ of error to review a decree affecting his interests. The contrary is the rule. This is true though he is not made a party to the action. (*People* v. *O'Connell,* 252 Ill. 304; *Anderson* v. *Steger,* 173 id. 112.) The writ of error in this case goes further than to complain of the refusal of the court to permit the Attorney General to intervene,—it attacks the decree as harmful to the public interest. Without regard to the question of the right of the Attorney General to intervene in the circuit court, the people have a right to have this decree reviewed by a writ of error. The Attorney General is the chief law officer of the State and is empowered to bring such action on behalf of the people as the law affords them. *Fergus* v. *Russel,* 270 Ill. 304; *Revell* v. *People,* 177 id. 468; *People* v. *General Electric Railway Co.* 172 id. 129.

It is said in the opinion that there is no doubt about the interest of the State in the continued operation of the railroad but that the decree does not in any way affect that interest. The decree provides for the offer of the property first in three parcels and then in twenty. The eighteen parcels, other than 12 and 12*a,* described in the decree, are as follows: Parcel 1 comprises 2.99 miles of railway in the city of Pekin and certain other lands in Tazewell county owned by the railroad, with tracks, right of way, buildings, switches, etc. Parcel 2, a strip of the railroad 8.98 miles in length, in Tazewell and Mason counties, extending from the southern end of parcel 1 to Manito, and including also all switch-tracks and other properties along that line. Parcel 3, the railway line from Manito to the depot at Havana, being 19.08 miles, more or less, and certain described properties incident and appurtenant thereto. Parcel 4, the railway line extending from Havana to Jacksonville, being 41.16 miles, and other property appurtenant thereto located in Havana. Parcel 5, the terminal properties in Jackson-

ville. Parcel 6, the line from Havana to Petersburg, being 23.42 miles in length. Parcel 7, the line from Petersburg to Springfield, being 22.55 miles in length. Parcel 7*a*, freight houses, tracks and property in Springfield. Parcel 8, the line from Springfield to a point one-half mile south of Curran, being 8.01 miles in length. Parcel 8*a*, the line from a point one-half mile south of Curran to a point one mile south of Waverly, consisting of 14.98 miles. Parcel 9, that portion of the track south of 8*a* to the crossing of the Carrollton branch of the C. & A. railway, a length of 20.69 miles. Parcel 10, from the C. & A. crossing to a point one mile north of Lock Haven, 35.09 miles. Parcel 11 includes the track from the point one mile north of Lock Haven to East St. Louis and also the west line to Grafton, the line to East St. Louis being 29.51 miles in length and the Grafton branch 8.4 miles. Certain other pieces of property in the decree described as belonging and appurtenant to these parcels of the railroad were also to be sold. Parcels 12 and 12*a* refer to the trust equipment and certain real estate. Parcels 13 and 14 constitute the balance of the equipment. Parcel 15 constitutes certain properties used for non-carrier purposes. Parcel 16 designates the Peoria and Pekin Union railway stock, and parcel 17 130 shares of capital stock in the Missouri and Illinois Bridge and Belt Railway Company.

It requires but the reading of the provisions of this decree to see that a sale in the twenty parcels authorized by it is as positive a destruction of this road as though the abandonment of it were specifically provided in the decree. For instance, parcel 8 is the line from Springfield to a point one-half mile south of Curran, consisting of 8.01 miles of railroad without terminal facilities, rolling stock or equipment. Parcel 8*a* is that part of the railroad extending from a point one-half mile south of Curran to a point one mile south of Waverly, consisting of 14.98 miles, with no equipment. These serve to illustrate that under separate sales to separate individuals no one would own a railroad, to say noth-

ing of taking such charged with a public duty to operate it. The opinion admits public interest in the operation of the road but at the same time approves a decree which authorizes a sale of the property in such a manner as to prevent its operation. No one contends that this railroad should not be sold. No one contends that the mortgagees are not entitled to a decree of sale, nor does anyone contend that the mortgagees are compelled to operate this road at a loss, or that the matter of continued operation of the road is one that can be determined in a foreclosure proceeding. Neither the continued operation of a railroad nor its abandonment can be determined, either directly or indirectly, in such proceeding. For that reason a decree which, in effect, prevents the operation of the road is beyond the power of a court to grant. A court of equity in a foreclosure proceeding has no more power to enter a decree that will, in effect, bring about the abandonment of a railroad than it has to order its continued operation at a loss. If, in order to get more money for the mortgagees, the people's rights may be destroyed without an opportunity to be heard, then they have no such rights. It is futile to say that the people have as much right against twenty purchasers of small parcels of the road as they have against the road as a whole. An owner of one or more of the small fragments, consisting of a few miles of railroad without terminal facilities or rolling stock, cannot, by the very nature of his possession, be charged with the duty to operate a railroad, and it seems absurd to say that he takes two lines of steel rail, or a railroad depot, charged with the public duty to operate a railroad. He has no railroad to operate. It is also said in the opinion that whatever action the people have is not affected by this decree. This cannot be true. Should the Attorney General object to the confirmation of a sale of this road in such parcels before the circuit court, he is met by the fact that this court has affirmed a decree authorizing just such sale and that the sale was made in accordance with such decree.

Should he later seek by *mandamus* to require the different individual owners of separate parts of what was once a railroad to carry out a duty to operate them or to prevent by injunction the tearing up of the rails, he is met by the fact that each of such owners owns his purchase separately, and not jointly with the owner of any other part, and that, not having a substantial portion of a railroad, he cannot be charged with the duty to operate that which he does not own. Thus it is seen that the admitted rights of the public become rights which no one is required to respect.

It is said that the mortgagees have a right to have the road sold in whatever manner will bring the most money, regardless of the mortgage contract and regardless of the interest of the public in its continued operation. The cases do not so hold. A railway company derives all its powers and privileges from the State which created it, and the bondholders enjoy the security of the mortgage because of the act of the legislature granting this power to the railway company. By acceptance of its charter from the State such company is permitted to exercise certain rights not enjoyed by individuals. It is given certain attributes of sovereignty itself, such as the power of eminent domain. It is likewise charged with the performance of certain public duties, namely, the duties of a common carrier. The public, therefore, have a direct interest in keeping it continuously open without any material diminution of its capacity to meet all the legitimate demands of the public. The duty rests upon a court ordering a sale of a railroad, to protect, if possible, the public interest. Such an interest certainly entitles the people to be heard, when, as here, a decree in a court of equity has been entered permitting a sale which will prevent the operation of the road and thereby destroy the interest of the public in it. The above view is supported by the courts of this country. (*Peoria and Springfield Railroad Co.* v. *Thompson,* 103 Ill. 187; *Chicago, Danville and Vincennes Railway Co.* v. *Loewenthal,* 93 id. 433; *Low* v.

*Blackford,* 87 Fed. 392; *State* v. *Bullock,* 78 Fla. 321; *New York Trust Co.* v. *Portsmouth and Extra Street Railway Co.* 192 Fed. 728; *State* v. *Dodds City, Montezuma and Trinidad Railway Co.* 53 Kan. 377; *Dayton, Xenia and Belpre Railroad Co.* v. *Lewton,* 20 Ohio St. 401; *Railroad Comrs.* v. *P. & O. C. R. R. Co.* 63 Me. 269; *Attorney General* v. *West Wisconsin Railway Co.* 36 Wis. 466; *Bullock* v. *State of Florida,* 254 U. S. 513; *Hood* v. *Ocklawaha Valley Railroad Co.* 78 Fla. 659; *Gates* v. *Boston and New York Air Line Railroad Co.* 53 Conn. 333.)   The opinion cites no cases to the contrary, and I know of none. Moreover, in this case the mortgage in terms provides that the road shall be sold as a whole. While the road may be said to have waived that provision by not objecting, it by no means follows that the people may not urge such provision if it is of benefit to the public interest.

It is said that it may be that the road will be sold as a whole or in units capable of operation, and not in the twenty parcels authorized by the decree. The validity of a decree is measured by what it authorizes. It gains no virtue by the fact that its invalid portions may not be carried out.

The facts as set forth in the record show that the road is 247 miles in length. Over $100,000 and much of its right of way were contributed by its patrons. There are sixty-six cities and villages, with a population of over 200,000, and an adjacent rural population of over 360,000, six coal mines, fifty-five grain elevators, thirty-seven banks, and at least twenty-one other industries, besides buildings and improvements placed along the line of the road, that are served thereby. Many are entirely dependent on this road for railway transportation. The evidence in the record tends to show that the loss in private property, alone, by the destruction of this road will amount to more than $16,000,000. Surely such a disastrous result to so many people and municipalities of the State should not be permitted unless upon the greatest necessity.

I am cónvinced that the decree in this çase renders possible the gravest injustice to the public and that it shoúld be reversed, with directions that a decree be entered that will not authorize a sale which destroys the road.

Mr. JUSTICE FARMER, also dissenting.

Mr. JUSTICE HEARD: I concur in the foregoing dissenting opinion of Mr. Justice Stone.